BLOOMSTEIN and others *v.* CLEES BROTHERS.

October Term, 1877.

RIGHT OF WAY—EQUITABLE ESTOPPEL—PAROL CONTRACT.—Equity will interfere, upon the ground of fraud and equitable estoppel, to prevent parties, by the assertion of a legal right, from interfering with the enjoy-

ment of a right of way over their lands, and of a ferry at the end thereof, connecting with a way on the other side of the river, purchased by the complainants and defendants, in pursuance of a parol agreement relating to the entire way, and as part of the common enterprise, and, by contract in writing between them, made a permanent way "from and beyond the river," appurtenant to their several tracts of land and every part thereof, into whosoever hands the same might come, large sums of money having been spent by the complainants in the common enterprise, and the whole way, including the ferry, having been used six years before the interference of the defendants.

*Gaut, Osment & Gaut*, for complainants.
*John Ruhm*, for defendants.

The Chancellor : — The demurrer to the bill is intended to raise the question whether the right of way claimed by the complainants over the land of the defendants can be maintained, if the agreement under which it is claimed was in parol.

The bill was filed on August 27, 1877, by Bloomstein and the administrator and heirs of M. Anderson, deceased, against six brothers of the name of Clees.  Bloomstein, Anderson, and the Clees brothers were the owners of large tracts of land in Bell's Bend of the Cumberland River, on its north bank.  The Clees brothers owned 1,600 acres, bounded by the river on the south and east.  Bloomstein owned 600 acres, bounded by the river on the south and west, and by the lands of the Clees brothers on the east; and Anderson owned 800 acres adjoining Bloomstein's land on the north, bounded by the river on the west, and the Clees brothers' on the east.  These three parties owned all the land in the bottom of the bend, the dividing line between the lands of the Clees brothers on the east, and of Bloomstein and Anderson on the west, striking the bend near the centre, and no person north of them could cross the river in the bend without passing over the lands of one or more of them. By crossing the river and striking the Charlotte Turnpike at a distance of about three-quarters of a mile, persons living in the bend could reach Nashville by that turnpike, the

distance in all being some six miles; whereas the distance to Nashville by going out of the bend to the north was nearly sixteen miles, and over bad roads. Under these circumstances, "it was agreed" between Bloomstein, Anderson, and the Clees brothers, in the spring of 1870, to open a road thirty feet wide to the river, on the line between the lands of Bloomstein and the Clees brothers, and part of the lands of Anderson, each adjoining proprietor giving one-half, establish a ferry, and buy the right of way south of the river to the Charlotte Turnpike. Each of the contracting parties was to contribute to the expenses of making the road and ferry-landing, the purchase of a ferry-boat, and of the right of way south of the river, in the proportion of the number of acres in their respective farms,—that is to say,the Clees brothers sixteen-thirtieths, Anderson eight-thirtieths, and Bloomstein six-thirtieths. In pursuance of this agreement, the parties caused a survey and location of the road to be made north of the river; but, afterwards, at the solicitation of the defendants, and upon their undertaking to give the right of way over their lands, the road was changed so as to diverge eastwardly through the lands of the defendants by a route proposed by them. This change of route necessitated the building of a bridge on the defendants' land, over a small stream. On November 7, 1870, the parties purchased and took a conveyance of the right of way, on the south side of the river, to the Charlotte Turnpike. This conveyance also embodies an agreement between the parties touching the right of way, and is signed by them. The road was completed on both sides of the river, the ferry established, an order being obtained from the County Court for this purpose, and the bridge built; the entire cost being about $3,000, of which Bloomstein and Anderson paid their full quota. The defendants agreed to employ one of their tenants to run the ferry, and keep regular accounts, the parties to share the profits or losses in the proportion of their investments. The road was completed and the ferry

established in 1871, and they were used by the parties and
their tenants, and by "the neighbors and citizens and their
tenants," and by the public generally, until July, 1877,
when the defendants, without the knowledge of the com-
plainants, procured an order from the County Court discon-
tinuing the public ferry, and have since refused to permit
the complainants to use the road or ferry, while they use it
for their own benefit.

The conveyance of the right of way on the south side of
the river shows, upon its face, that the way was intended to
be for the use of the parties from a ferry on the river to the
Charlotte Turnpike, although the fee to the land conveyed
was vested in them.   It also contains an agreement between
Bloomstein, Anderson, and the Clees brothers, in the follow-
ing language : " But, as between and among the individuals
composing the second party hereto, it is understood and
agreed that said strip of land is to be held as an easement
appurtenant to the tracts of land now owned by them,
respectively, on the west side of the Cumberland River in
said county, not to be separated from said lands by sale,
devise, or bankruptcy ; and that, upon either of the indi-
viduals of the second part ceasing to be owner of any
interest in either of said tracts, from whatever cause his
interest may cease, his right, title, or interest in the above
strip of land shall also cease, and be transferred to the party
acquiring his interest in the tract to which the easement is
appurtenant ; nor shall the right or title of any of the par-
ties of the second part, in the above strip of land, be liable
to sale for his debts, either under execution or bankruptcy ;
but the said strip, of the full width of thirty feet, shall be
held by said parties of the second part, as between them-
selves, for a general open way for a passage on foot, with
horses, carts, wagons, and other carriages, and for all pur-
poses to be the common property of them, their heirs and
assigns, to be forever kept open as a common way, in,
through, over, along, and across said strip of land, and to

be used at any hour of the day or night, with the right to use the rock and other things within the bounds of said strip in building and repairing said road; to be for the benefit and use of all the parties of the second part as long as they remain owners of said strip of land, and to follow said tracts, and every part thereof, into whosoever hands they may come, to furnish a way from and beyond the Cumberland River to and beyond the Charlotte Turnpike, and the reverse, for all persons going from or coming to said tracts of land, or any part thereof."

This instrument, to which the defendants are parties, signing it by the name of Clees Brothers, expressly provides that the strip of land then bought is to be held, as between them and Bloomstein and Anderson, " for a general open way," appurtenant to their several tracts of land, " and every part thereof," into whosoever hands they may come, " and to furnish a way from and beyond the Cumberland River for all persons going from or coming to said tracts of land, or any part thereof." By itself, this language might not necessarily imply more than a continuous right of way from the river to the turnpike, but, when taken in connection with the general agreement to establish the ferry and the road on the north side of the river, it probably imposes upon the defendants the duty of good faith touching the whole of the agreement. They cannot, after joining the other parties in a common enterprise, be allowed to deprive those parties of any of those rights expressly stipulated for, or reap individual benefit at their expense. Community of interest produces community of duty, and it would be inequitable to permit one of the contracting parties to do any thing to the prejudice of the others, in relation to the common property. *Harrison* v. *Winston*, 2 Tenn. Ch. 547, and cases cited. I am not, therefore, prepared to say that a written agreement of this character, touching a part of a connected right of way, would not be sufficient, under our Statute of Frauds, as an equitable estop-

pel to prevent the defendants from interfering with the right of way which the proof may show to be necessary to the enjoyment of the right expressly conceded by the writing. *Brown* v. *Berry*, 6 Coldw. 102. Conceding the law to be strictly as claimed by the demurrer, it is precisely one of those cases of legal right which ought not to be determined except upon a final hearing on the facts. *Brownsword* v. *Edwards*, 2 Ves. 247.

But the legal right has been argued ably by the learned counsel on both sides, and I am prepared to state the conclusions to which that argument and an examination of the authorities have led me.

A right of way is an incorporeal hereditament, and is, doubtless, embraced in our Statute of Frauds, which prohibits an action "upon any contract for the sale of lands, tenements, and hereditaments," unless in writing. *Harris* v. *Miller*, Meigs, 158, and Mr. Meigs' note at the end of the case. In this view, a right of way may, of course, be acquired by seven years' adverse possession by user, under our Statute of Limitations, which includes, in like manner, "lands, tenements, and hereditaments." Code, secs. 2763, 2765; *Jarnagin* v. *Mairs*, 1 Humph. 479; *Heiskell* v. *Cobb*, 11 Heisk. 638. But the period of user in this case was only about six years, and, therefore, insufficient to complete the bar. The complainants are, consequently, compelled to stand upon the agreement as a parol license, coupled with an interest, working an equitable estoppel.

A mere license is, in its very nature, revocable, and confined to the parties between whom it is made. But a license loses its revocable character whenever it is coupled with the grant of an interest, or when an interest exists which depends upon, or cannot be enjoyed without the aid of, the license. *Thomas* v. *Sorrel*, Vaugh. 350; *Wood* v. *Leadbetter*, 13 Mee. & W. 844. So, if the license be executed. *Pierrepont* v. *Barnard*, 6 N. Y. 279. It is obvious, however, that to give an oral license in regard to land an effect

which is denied to an oral contract would be virtually to abrogate the Statute of Frauds. At law, therefore, a license relating to land remains revocable, unless the interest with which it is coupled is legally granted; that is, where the Statute of Frauds applies, by a written instrument. But it has long been settled that equity may control the words of the statute, in order to prevent it from being used as a cover for the commission of the frauds which it was meant to suppress. It is the fraud which calls into play the jurisdiction of the court. Upon this ground rest the decisions which enforce the specific execution of parol contracts touching land, when there has been part performance. 1 Story's Eq. Jur., sec. 330. In this state, our judiciary, at an early day, concluded to adhere rigidly to the statute, and refused to follow the decisions mentioned. *Patton* v. *McClure*, Mart. & Y. 333. In that very case, however, the court said that if a man knowingly suffer another to purchase and expend money on land, under an erroneous opinion of title, without making his claim known, he would be estopped to set up his title against such person. This ruling has been repeated in subsequent cases. *Morris* v. *Moore*, 11 Humph. 434; *Chester* v. *Greer*, 5 Humph. 26. Another qualification of the earlier doctrine was made in *Sneed* v. *Bradley*, 4 Sneed, 301. It was there held that a verbal contract for the sale of land was voidable, rather than void, and that the purchaser could maintain no action to recover back the consideration paid, while the vendor was able, ready, and willing to perform the agreement by making a conveyance. Of course, the converse would be true where suit was brought to recover the land. This opinion of one of our ablest judges was followed by another equally eminent judge, in *Hilton* v. *Duncan*, 1 Coldw. 313. It was either approved or followed in *Roberts* v. *Francis*, 2 Heisk. 128; *Hamilton* v. *Gilbert*, 2 Heisk. 680; *Masson* v. *Swan*, 6 Heisk. 651; *McClure* v. *Harris*, 7 Heisk. 379. It has, however, been recently repudiated, and the cases in which it was first

announced directly overruled. *Biggs* v. *Johnson*, at Jackson, October term, 1876. The only exceptions which, under this latest decision, equity can make to the statute are those resting on fraud, and there is a long line of English and American cases of equitable estoppel based on this ground.

The earliest case on this subject is that of *Short* v. *Taylor*, decided by Lord Somers, and cited in 2 Eq. Ca. Abr. 522. There, a person built a house, laying part of his foundation on the land of another, who, seeing this, did not forbid him, and, on the contrary, very much encouraged it; but when the house was built brought an action. Lord Somers granted an injunction, and said it was just and reasonable ; for, being a nuisance, every continuance is a fresh nuisance, and so he would be perpetually liable to actions, which would be hard when encouraged by the party himself. A case still more in point is cited by Lord Loughborough, in *Jackson* v. *Cator*, 6 Ves. 690. " There was a case," says his lordship, " against Mr. George Clavering, in which some person was carrying on a project of a colliery, and had sunk a shaft at a considerable expense. Mr. Clavering saw the thing going on, and in the execution of that plan it was very clear the colliery was not worth a farthing without a road over his ground; and (afterwards) when the work (of the colliery) was begun, he said he would not give the road. The end of it was, that he was made sensible, I do not know whether by decree or not, that he was to give the road at a fair value." The case then before the court was where a lease had been granted, " reserving all trees and timber-like trees and pollards, and all plants and shrubs that are or may be planted." The lessee having, with the knowledge and approval of the lessor, laid off part of the premises into a lawn, planting shrubberies, etc., the court enjoined the lessor from exercising his reserved rights by cutting down the timber in the lawn. The principle relied on was, that when a person has stood by, seeing the act

done, or has consented to it, he shall not exercise his legal right in opposition to that permission. 'Citing *Stiles* v. *Cowper*, 3 Atk. 692 ; *East India Company* v. *Vincent*, 2 Atk. 83 ; *Hardcastle* v. *Shafts*, 1 Anst. 184.   Lord Eldon had the question before him in *Dann* v. *Spurrier*, 7 Ves. 235, and considered it with his usual cautious accuracy.   " I fully subscribe," he says, " to the doctrine of the cases that have been cited, that this court will not permit a man knowingly, though but passively, to encourage another to lay out money under an erroneous opinion of title ; and the circumstance of looking on is, in many cases, as strong as using terms of encouragement.   Still, it must be put upon the party to prove the case by strong and cogent evidence, leaving no reasonable doubt that he acted upon that sort of encouragement.   It is upon the plaintiff to prove, not merely to raise a probable conjecture, but to show, upon highly probable grounds, a case of bad faith and bad conscience against the defendant."   Lord Romilly, as Master of the Rolls, had the question before him repeatedly, and thus states the law : " The principle on which the defendants rely is one often recognized by this court, namely, that if one man stand by and encourage another, though but passively, to lay out money under an erroneous opinion of title, or under the obvious expectation that no obstacle will afterwards be interposed in the way of his enjoyment, the court will not permit any subsequent interference with it by him who formerly promoted and encouraged those acts of which he now complains, or seeks to obtain the advantage."   " This is the rule," he adds, " laid down in *Dann* v. *Spurrier*, 7 Ves. 231 ; *Powell* v. *Thomas*, 6 Hare, 300, and many other cases, to which it is unnecessary to refer, for the principle is clear." *Rochdale Canal Co.* v. *Sling*, 16 Beav. 634 ; *Duke of Devonshire* v. *Eglin*, 14 Beav. 530 ; *Duke of Beaufort* v. *Patrick*, 17 Beav. 75 ; *Mold* v. *Wheatcroft*, 27 Beav. 510.   Two of these cases involved the carrying of water across the land of another, and the last the running of a tramway and rail-

road across the land ; and in the cases in 16 and 17 Beavan, the bills were filed after recovery at law. To the same effect is *Somersetshire Coal Canal Company* v. *Harcourt*, 2 De G. & J. 608. "A party," says Lord Cottenham, "may so encourage that which he complains of as a nuisance as not only to preclude himself from complaining of it in equity, but to give the adverse party a right to the interposition of a court of equity in the event of his complaining of the nuisance at law." *Williams* v. *Earl of Jersey*, Cr. & Ph. 97.

The American authorities are in accord, so that the editors of the American Leading Cases feel themselves justified in thus condensing the result: "A writing is indispensably requisite, under the provisions of the Statute of Frauds, whenever an estate or interest in land is to be affected, *unless the circumstances are such that a refusal to execute the agreement would operate as a fraud.*" 2 Am. Ld. Cas. 558. And the American cases have announced two conclusions, in the matter of licenses touching realty, which commend themselves to our sense of morality and justice. The first is that expressed by Judge Gibson in *Swartz* v. *Swartz*, 4 Barr, 358 : "When the revocation of a license would operate as a fraud, a chancellor will turn the licensor into a trustee *ex maleficio* for the licensee, on principles analogous to those which apply when the owner of land stands by and allows another person to make improvements on it, under the belief that he will be allowed to reap the fruits of his labor and expenditures." The second, in which all the cases concur, is that a license, coupled with an interest, under which expenditures have been made with the expectation, induced by the licensor, of enjoyment, cannot be withdrawn without tendering the money expended. *Clement* v. *Durgin*, 5 Me. 9 ; *Woodbury* v. *Parghley*, 7 N. H. 237 ; *Addison* v. *Huck*, 2 Gill, 521 ; *McKellip* v. *McIlhenny*, 4 Watts, 317.

The only case we have on the subject tends in the same direction. *Caldwell* v. *Scott*, 10 Yerg. 209. And the res-

ervation, from a literal adhesion to the Statute of Frauds, made in *Patton* v. *McClure*, Mart. & Y. 333, and noticed above, is placed upon the principles of these decisions, namely, fraud and equitable estoppel.

The demurrer must be overruled.